MATTHEW DREW MILLER, )
)
    *Plaintiff,* )
) No. 1:23-CV-86
v. )
) Judge Collier
COUNTY OF HAMILTON, TENNESSEE, )
et al., ) Magistrate Judge Dumitru
)
    *Defendants.* )

# <u>M E M O R A N D U M</u>

Plaintiff, by and through counsel, filed this action under 42 U.S.C. § 1983 and Tennessee law related to injuries he sustained during his April 2022 incarceration at the Hamilton County Jail ("Jail") [*See generally* Doc. 1]. Before the Court are motions for summary judgment filed by (1) Hamilton County, Tennessee ("the County") [Doc. 39]; (2) forty-two individual correctional officers ("COs") (collectively "Officer Defendants[1]") [Doc. 40]; (3) Sheriff Jim Hammond [Doc. 41]; and (4) QCHC of Tennessee, PLLC ("QCHC"), Nurse Erica Watson, Nurse Lorie Graves, Nurse Kenneth Crider, Jr., Nurse Majorie Alfinda (named in complaint as "M. Alfinda"), Nurse Kelly Powell, Nurse Rebecca Edwards (named in complaint as "Nurse Edwins"), Donald Kern, M.D., Nurse Cheynne Hux (named in complaint as "Cheyenne Hux, M.D."), and Johnny Bates, M.D. (collectively "Healthcare Defendants") [Doc. 54]. Plaintiff has filed a response opposing

---

[1] The individual officer Defendants are James Lewis, Tyler Holland, Samuel Stephenson, Paul Hicks, Benjamin Peery, Eric Qualls, Cerion Carson, John Hargis, Brandon Booth, Stephen Roberts, Dylan McCloud, Rodney Terrell, Jessee Baskowsky, Officer Robertson, Officer Chastain, Officer Gelacio, Officer Hughes, Officer Greene, Officer Ackerman, Officer Allen, Officer Gazzaway, Officer Bradford, Officer Thompson, Officer Green, Officer Johnson, Officer Ledford, Officer Castellanos, Officer Taylor, Officer Craig, Officer Satterfield, Officer Kernea, Officer Pitre, Officer Perich, Officer Murphy, Officer Ortwein, Officer Wyatt, Officer Horn, Officer Rowlands, Officer Jackson, Officer Chisolm, Officer Smith, and Officer Hartman [*See* Doc. 1].

the motions [Doc. 58], to which Defendants replied [Docs. 59, 60]. Upon consideration of the parties' pleadings, the competent summary judgment evidence, and the applicable law, Defendants' motions for summary judgment [Docs 39, 40, 41, 54] will be **GRANTED** as to Plaintiff's federal claims, the Court will **DECLINE** to exercise supplemental jurisdiction over Plaintiff's state-law claims, and this action will be **DISMISSED**.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party has not made a showing sufficient to establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

Once the motion is properly supported, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 888–89 (1990)). That is, to successfully oppose a motion for summary judgment, "the non-moving party . . . must

present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson*, 477 U.S. at 252).

The very purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for trial." Fed. R. Civ. P. 56 advisory committee's note to the 1963 amendments. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that, despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (Plaintiff in this case), must come forward with proof to support each element of his claim. Plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan*, 497 U.S. at 888, or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888.

In considering a motion for summary judgment, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . [the ultimate decision becomes]. . . a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

## II.      THE PARTIES' EVIDENCE

### A.      Undisputed Facts

*Factual Background.* On April 14, 2022, Plaintiff reported to the Jail on an outstanding warrant for his arrest, which was issued due to his failure to appear at a prior court date [Doc. 55 ¶ 1; Doc. 58 p. 14 ¶ 1]. The following day, April 15, 2022, Plaintiff was placed in the Delta 1 unit with inmates Correy Greer, John Hughley, Keontae Maurice Clark, and David Cosby [Doc.

3

45 ¶ 12; Doc. 58 p. 12 ¶ 12]. Booking pre-classification checklists were completed for each inmate housed with Plaintiff, and each was designated as maximum security pursuant to Hamilton County Sheriff's Office ("HCSO") policy [Doc. 45 ¶ 13; Doc. 58 p. 12 ¶ 13]. Jail records reflected no identified incompatibilities between Plaintiff and any inmate housed with him on April 15, 2022 [Doc. 45 ¶ 14; Doc. 58 p. 12 ¶ 14]. Nor did Plaintiff report any threats, request protective custody, or express concern for his safety prior to the placement [Doc. 45 ¶ 16; Doc. 58 p. 13 ¶ 16]. Further, no other inmate or person provided Jail staff with information identifying a threat to Plaintiff [Doc. 45 ¶ 17; Doc. 58 p. 13 ¶ 17].

Plaintiff was beaten and raped in Delta 1 on April 15, 2022 [Doc. 55 ¶ 3; Doc. 58 p. 14 ¶ 3]. Nurse Cheyenne Hux was called to the pod to evaluate Plaintiff at 4:51 p.m., and Plaintiff told her he had been assaulted and raped [Doc. 55 ¶ 4; Doc. 58 p. 14 ¶ 4]. Nurse Hux noted welts to Plaintiff's left arm, two superficial puncture wounds to his mid-back, a swollen left wrist with an abrasion, a laceration to the back of his head, swelling to the right side of his face, and a deep laceration to his forehead that she believed would require stitches [Doc. 55 ¶ 5; Doc. 58 p. 14 ¶ 5]. Plaintiff was sent out to the emergency department for evaluation at 5:00 p.m. [Doc. 55 ¶ 7; Doc. 58 p. 14 ¶ 7].

Plaintiff was transported to Erlanger East Hospital ("Erlanger"), where Detective Rominger observed his injuries, a sexual assault examination was conducted, and evidence was collected [Doc. 45 ¶ 21; Doc. 58 p. 13 ¶ 21]. Detective Rominger also conducted an investigation that included reviewing Jail records and interviewing Plaintiff and John Hughley [Doc. 45 ¶ 22; Doc. 58 p. 13 ¶ 22].

At the emergency department, Plaintiff received a CT scan of his brain and cervical spine, CT scan of his right knee, an ECG, and x-rays of his chest, forearm, and right humerus [Doc. 55 ¶

4

8; Doc. 58 p. 14 ¶ 8]. Plaintiff also received medications and prescriptions for pain, anxiety, and muscle spasms [Doc. 55 ¶ 9; Doc. 58 p. 15 ¶ 9]. Plaintiff was prescribed the following regimen of prophylactic HIV medications: emtricitabine-tenofovir (Truvada) to be taken once daily for twenty-eight days, and dolutegravir (Tivicay) to be taken once daily for twenty-eight days [Doc. 55 ¶ 11; Doc. 58 p. 15 ¶ 11]. Plaintiff was advised to follow-up with orthopedic and general surgery in one week [Doc. 55 ¶ 10; Doc. 58 p. 15 ¶ 10].

Plaintiff returned to the Jail where, at 12:02 a.m. on April 16, 2022, Nurse Kelly Powell performed an intake history and physical assessment of Plaintiff [Doc. 55 ¶ 12; Doc. 58 p. 15 ¶ 12]. At that time, Plaintiff was also assessed for mental health issues, scheduled for a mental health follow-up, and placed on the provider's list to be seen no later than April 22, 2022 [Doc. 55 ¶ 14; Doc. 58 p. 15 ¶ 14].

At approximately 1:21 a.m. on April 16, 2022, Dr. Johnny Bates reviewed Plaintiff's medical records and wrote prescriptions "for more clinically reasonable alternatives" to the HIV prophylactics (i.e., Tivicay and Truvada) that had been prescribed at the hospital [Doc. 55 ¶ 15; Doc. 58 p. 15 ¶ 15]. Specifically, Dr. Bates changed Plaintiff's Tivicay prescription to Isentress (Raltegravir), a guideline acceptable alternative to Tivicay [Doc. 55 ¶¶ 16–17; Doc. 58 p. 15 ¶¶ 16–17]. He also changed Plaintiff's prescription for Truvada to Descovy, which is a guideline acceptable alternative to Truvada [Doc. 55 ¶¶ 18–19; Doc. 58 p. 15 ¶¶18–19]. Descovy has a more favorable renal and bone safety profile and was readily available through the Jail's pharmacy at the time [Doc. 55 ¶ 20; Doc. 58 p. 15 ¶ 20]. Both Truvada and Descovy contain emtricitabine plus tenofovir integrase inhibitors [Doc. 55 ¶ 21; Doc. 58 p. 15 ¶ 21]. Dr. Bates wrote the prescription for Descovy to be taken once daily for three days, and the Isentress to be taken twice

daily for three days [Doc. 55 ¶¶ 22, 23; Doc. 58 p. 15 ¶ 22, p. 16 ¶ 23]. Nurse Powell verified Plaintiff's medications at 1:21 a.m. on April 16, 2022 [Doc. 55 ¶ 24; Doc. 58 p. 16 ¶ 24].

Plaintiff received his morning dose of Isentress on med pass on April 16, 2022, at 10:57 a.m. from Nurse Alfinda [Doc. 55 ¶ 25; Doc. 58 p. 16 ¶ 25]. Plaintiff received his daily dose of Descovy during evening med pass per notes of Nurse Powell [Doc. 55 ¶ 27; Doc. 58 p. 16 ¶ 27]. On April 17, 2022, Plaintiff received his morning dose of Isentress at 10:58 a.m. from Nurse Crider [Doc. 55 ¶ 28; Doc. 58 p. 16 ¶ 28]. But Plaintiff missed his evening doses of Isentress and Descovy on April 17 [Doc. 55 ¶ 29; Doc. 58 p. 16 ¶ 29]. Also on April 17, 2022, Plaintiff was seen and evaluated by the mental health provider [Doc. 55 ¶ 32; Doc. 58 p. 16 ¶ 32].

On April 18, 2022, Plaintiff received his morning dose of Isentress from Nurse Crider at 12:31 p.m. and his Descovy and evening dose of Isentress at 7:13 p.m. during Nuse Alfinda's med pass [Doc. 55 ¶¶ 30, 31; Doc. 58 p. 16 ¶¶ 30, 31]. Also on April 18, 2022, Plaintiff was scheduled for a follow-up with orthopedic surgery and general surgery for April 22, 2022 [Doc. 55 ¶¶ 33, 34; Doc. 58 p. 16 ¶¶ 33, 34].

On April 19, 2022, Plaintiff was released from the facility at 11:47 a.m., prior to scheduled medication administration [Doc. 55 ¶ 35; Doc. 58 p. 16 ¶ 35]. At the time of his release, Plaintiff signed a release form, which noted that the medications being transferred to Plaintiff upon discharge included Raltegravir (Isentress) and Descovy [Doc. 55 ¶¶ 36, 37; Doc. 58 p. 16 ¶¶ 36–37]. Plaintiff was advised as to the proper use and side effects of these medications and counseled to seek post-release medical care [Doc. 55 ¶ 38; Doc. 58 p. 16 ¶ 38].

*County Policies.* The HCSO maintains written policies governing inmate operations, including intake, booking, supervision, classification, grievances, and inmate rights [Doc. 45 ¶ 6; Doc. 58 p. 12 ¶ 6]. Pursuant to HCSO Policy 90.05.09(J)(1), all detainees are initially classified

6

as maximum security during intake and booking for institutional safety until full classification is completed [Doc. 45 ¶ 7; Doc. 58 p. 12 ¶ 7]. Detainees are temporarily housed in holding or intake status to allow staff to complete the classification process, magistrate appearances, and bond-related processes [Doc. 45 ¶ 11; Doc. 58 p. 12 ¶ 11].

Classification is a multi-factor process requiring review of current charges, criminal history, prior institutional behavior, gang affiliations, NCIC and TOMIS information, medical and mental health status, and known incompatibilities [Doc. 45 ¶ 8; Doc. 58 p. 12 ¶ 8]. But no inmate is placed in Delta unit until he or she is classified for such placement [Doc. 45 ¶ 11; Doc. 58 p. 12 ¶ 11].

In 2022, corrections officers received 260 hours of pre-service training, including training mandated by the Tennessee Corrections Institute, the American Correctional Association, the Prison Rape Elimination Act, Peace Officer Standards and Training, and the National Commission on Correctional Health Care [Doc. 45 ¶ 9; Doc. 58 p. 12 ¶ 9].

*Healthcare Policies*. QCHC provides health care services at the Jail under a "cost plus" contract, which means that QCHC bears no burden for the cost of medications administered to inmates [Doc. 55 ¶ 46; Doc. 58 p. 17 ¶ 46]. QCHC policy J-B-04 provides for treatment services at no cost, training of healthcare staff in how to respond to sexual assault, with such training including immediate treatment, counseling services, and continuity of care to minimize the chance for HIV infection through medication [Doc. 55 ¶ 50; Doc. 58 p. 17 ¶ 50]. QCHC maintains a policy for the administration of clinically appropriate, timely, safe, and sufficient medication services, which includes the continuation of medications off site or an acceptable alternative medication where appropriate [Doc. 55 ¶ 51; Doc. 58 p. 17 ¶ 51]. QCHC has a policy for inmates requiring off-site medical care, which includes a requirement that individuals treated off site will,

7

upon return, be scheduled for a provider care clinic [Doc. 55 ¶ 52; Doc. 58 p. 17 ¶ 52]. Staff are trained on these and other policies and evaluated regularly regarding their application [Doc. 55 ¶ 53; Doc. 58 p. 17 ¶ 53].

Neither QCHC nor the Healthcare Defendants are responsible for providing security for inmates at the Jail, nor do these Defendants make housing assignments [Doc. 55 ¶ 54; Doc. 58 p. 18 ¶ 54].

### B.      Plaintiff's Proof

Within approximately ten minutes of entering the inmate population housing area of the Jail on April 15, Plaintiff was beaten by a group of inmates and sexually assaulted by another inmate [Doc. 58 p. 21 ¶¶ 4–6]. During the assault, Plaintiff sustained numerous physical injuries, "including facial fractures, stab wounds, injuries to [his] knee, and other trauma" [*Id.* ¶ 7]. Plaintiff "did not observe any jail staff intervene to stop the assault while it was occurring" [*Id.* ¶ 9].

Following the assault, Plaintiff was transported to Erlanger, where he was diagnosed with head trauma, facial fractures, stab wounds, knee injuries, and sexual assault and was prescribed multiple medications for pain management, infection prevention, and HIV post-exposure prophylaxis [*Id.* at 115, 117–18, 121–24]. He received four staples to the right side of his head, six to the "back/right side of the head," and thirteen sutures to a laceration on his forehead [*Id.* at 80]. Additionally, he was prescribed both opioid and non-opioid pain medications [*Id.* at 128–131].

Plaintiff testifies that medical staff at Erlanger told him that "inpatient medical observation was recommended[,]" but Plaintiff was nonetheless returned to the Jail, where he experienced "severe pain, dizziness, nausea, and difficulty moving" [*Id.* at 21 ¶¶ 11, 12, 13]. Because he

8

could not stand or walk normally, Plaintiff had to shout for assistance to obtain water or access the restroom [*Id.* at 22 ¶ 14]. Plaintiff avers that he was left on the concrete floor for extended periods of time, and that his requests were often ignored or inadequately addressed [*Id.* at 22 ¶¶ 15–16]. Plaintiff did not receive the prescribed pain medication or consistently receive medications intended to reduce the risk of infection following the assault [*Id.* at 22 ¶¶ 17–18]. QCHC records reflect that certain PRN medications (i.e., those medications to be administered "as needed") were repeatedly not administered, sometimes with the bare notation "PRN not needed" [*Id.* at 57, 58, 59, 60, 88, 92, 102, 103, 104, 105, 106, 107, 108]. Plaintiff attests that he experienced ongoing pain and symptoms during this period [*Id.* at 21–22 ¶¶ 13–19, 22].

When Plaintiff was finally able to contact his mother several days after the assault, he was in significant physical and emotional distress [*Id.* at 22 ¶¶ 20, 21]. Plaintiff continued to experience physical symptoms, including pain and dizziness, for an extended period after his release [*Id.* at 22 ¶ 22]. Plaintiff testifies that he has since been diagnosed by medical professionals with major depressive disorder, anxiety, post-traumatic stress disorder, and agoraphobia, and that he has been unable to return to meaningful employment due to his physical and psychological conditions [*Id.* at 22 ¶¶ 24, 25]. Plaintiff maintains he has lost employment opportunities and personal relationships because of the injuries and trauma he suffered in custody, and that he continues to suffer physical limitations and psychological distress related to the incident [*Id.* at 22 ¶¶ 26, 27].

Plaintiff's mother, Theresa Heiler Eyssen, attests that once Plaintiff told her he had been assaulted, she was "extremely alarmed by his condition and immediately contacted 911 to request a welfare check" [*Id.* at 25, 26 ¶¶ 1, 18]. She maintains that Jail staff informed her that the facility

had been understaffed at the time of the incident, which fell on the Easter holiday weekend [*Id.* at 25 ¶¶ 6, 8].

Ms. Eyssen testifies that on April 18, 2022, she spoke with Sergeant Green, the shift sergeant on duty following the incident [*Id.* at 25 ¶ 9]. Ms. Eyssen states that when she asked what could be done to protect Plaintiff, Sergeant Green told her it was "the job of the jail to protect prisoners" [*Id.*].

Ms. Eyssen testifies that Plaintiff told her that (1) an emergency room physician had recommended Plaintiff be admitted for observation due to the severity of his injuries; (2) he had been left on the floor without adequate assistance from staff in the days following his return to the Jail; and (3) he did not receive his medications as prescribed, including medications for pain and to reduce the risk of infection [*Id.* at 25–26 ¶¶ 11, 14–16]. After Plaintiff's release from custody, Ms. Eyssen contacted the Jail regarding his missing medications and reports she was told that they had been found behind a desk after his release [*Id.* at 26 ¶ 17].

Following Plaintiff's release, Ms. Eyssen observed that Plaintiff suffered difficulty walking, persistent pain, emotional distress, and fear [*Id.* at 26 ¶ 19]. She avers that Plaintiff has since been diagnosed with major depressive disorder, anxiety, post-traumatic stress disorder, and agoraphobia [*Id.* at 26 ¶ 20]. Ms. Eyssen maintains that Plaintiff has lost employment opportunities and personal relationships because of the physical and psychological effects of the assault, and that he now lives with her, as he is currently unable to live independently [*Id.* at 26–27 ¶¶ 22–23].

### C. Defendants' Proof

#### 1. The County and Officer Defendants

After the HCSO Sheriff assumed authority over the Jail in 2021, new COs who had

previously worked at Silverdale Detention Facility were required to participate in pre-service training as though they had not previously worked in a detention facility [Doc. 47 ¶ 22]. This includes over 200[2] hours of initial training and at least 48 hours of additional formal training annually [*Id.* ¶¶ 6–9].

Plaintiff and inmates Hughley, Clark, Greer, and Cosby were all classified as maximum security during the booking process, pursuant to HCSO policy [Doc. 46 ¶¶ 17, 18]. Prior to their placement in the Delta unit on April 15, 2022, there were no incompatibles identified among any of the inmates, and there was no indication that any assaultive behavior was likely to occur [*Id.* ¶¶ 19, 20, 21].

At approximately 3:15 p.m. on April 15, 2022, Deputy Bell heard someone yelling, "Hey, CO" and looked into Delta 1, where he saw people standing around Plaintiff, who was sitting nude on a bench [Doc. 49-1 p. 1]. Deputy Bell removed Plaintiff from the cell, covered him with a blanket, and called for medical personnel and his supervisors, because Plaintiff looked as though he had been assaulted [*Id.*]. Deputy Bell reports that Plaintiff then stated that he had been beaten and raped, and he identified inmates Hughley, Cosby, Clark and Greer as the assailants [*Id.*].

At approximately 3:24 p.m., Deputy Fuller responded to the Jail for a report of sexual assault, and a medic was preparing Plaintiff for transport to the hospital when he arrived [*Id.* at 7]. Deputy Fuller records that Plaintiff stated that four males dragged him into the showers and beat him with their fists and a broom/broom handle [*Id.*]. Plaintiff reported to Deputy Fuller that he felt a penis inserted in his anus during the beating, and that he had given the names of his assailants to staff [*Id.*]. Deputy Fuller records that Sgt. Robertson advised him that they were reviewing

---

[2] In January of 2022, 260 hours of pre-service training was required [Doc. 47 ¶ 7]. The training now consists of 292 hours of instruction [*Id*. ¶ 8].

the cameras for evidence of the crime [*Id.*]. Deputy Fuller also states that Sergeant Robertson collected the weapon from the cell, and Deputy Fuller then entered it into property [*Id.*].

Detective Shane Rominger with the HCSO was contacted by HCSO personnel regarding an alleged rape in the Delta unit of the Jail at approximately 4:11 p.m. on April 15, 2022, and responded to Erlanger and observed the injuries to Plaintiff [Doc. 49 ¶¶ 1–5]. A sexual assault nurse examiner collected evidence from Plaintiff for a sexual assault kit [*Id.* ¶ 6]. Detective Rominger testifies that, as part of his investigation, he obtained written statements, reviewed Jail records, and conducted interviews [*Id.* ¶¶ 7–9]. Detective Rominger claims that he interviewed Plaintiff and inmate (and suspect) John Hughley, and their accounts were not consistent [*Id.* ¶¶ 8–9]. Neither inmate reported a prior issue with the other [*Id.* ¶ 9]. Detective Rominger did not discover any information that the other assailants had prior knowledge or association with Plaintiff, and he was unable to discover a motive for the assault [*Id.* ¶¶ 7, 9].

Detective Rominger periodically reviewed the status of this case throughout 2022 and into 2023 while awaiting the Tennessee Bureau of Investigation's ("TBI") laboratory report of the sexual assault kit [*Id.* ¶ 11]. Detective Rominger reviewed the TBI report associated with this case on March 31, 2023 [*Id.* ¶ 12]. According to Detective Rominger, the report did not indicate the presence of semen, and there was insufficient evidence to substantiate a rape charge [*Id.* ¶¶ 12, 13]. Detective Rominger attempted to contact Plaintiff using the contact information provided but was unable to do so, as the available telephone numbers were no longer assigned to Plaintiff [*Id.* ¶ 15].

### 2.  QCHC and Healthcare Defendants

Dr. Johnny Bates, the CEO and founder of QCHC, was employed as a physician at the Jail between April 15 and April 19, 2022, and was personally involved in Plaintiff's treatment during

12

that time [Doc. 56 ¶¶ 1–5, 9]. Dr. Bates notes that after Plaintiff reported his assault, he was evaluated per QCHC policy and sent to the emergency room [*Id.* ¶ 11]. There, Dr. Bates confirms, Plaintiff was given prescribed medications to limit his exposure to HIV—Tivicay and Truvada—and discharged back into the Jail during the early morning hours of April 16, 2022 [*Id.*].

Upon Plaintiff's return to the Jail, Dr. Bates wrote Plaintiff prescriptions for Isentress and Descovy, which are "more clinically reasonable alternative[s]" to the prophylactic medications he was prescribed in the emergency room [*Id.* ¶ 12]. Plaintiff received doses of these medications as scheduled up until his discharge from the Jail, except for evening med pass on April 17 [*Id.* ¶¶ 13–16]. Dr. Bates avers that missing a single dose of Isentress and Descovy would not have created a substantial risk of harm that Plaintiff might contract HIV, as his medication regimen had been started immediately upon the report and rape of the assault [*Id.* ¶ 17]. Dr. Bates further testifies that Plaintiff received medication and treatment for his other injuries [*Id.* ¶ 18].

QCHC does not determine housing placements, nor is it responsible for the security of inmates housed at the jail [*Id.* ¶ 10].

## III.     ANALYSIS

Plaintiff claims Fourteenth Amendment violations by all Defendants; *Monell* liability against the County and Sheriff Hammond based on claims of failure to train and supervise; state-law negligence and emotional distress claims against all Defendants; and claims for declaratory and injunctive relief against all Defendants [Doc. 1 ¶¶ 126–65]. The Court takes these claims in turn.

### A.     Fourteenth Amendment

#### 1. Failure to Protect

13

Plaintiff alleges that Defendants violated his Fourteenth Amendment rights by failing to protect him from an assault by other prisoners. Because Plaintiff was a pretrial detainee at the time he was assaulted, a prison official's failure to protect Plaintiff rises to the level of a constitutional violation only where Plaintiff was "incarcerated under conditions posing a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), to which the prison official "acted (or failed to act) deliberately and recklessly[,]" *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 728 (6th Cir. 2022) (citing *Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585, 596 (6th Cir. 2021)). A constitutional violation occurs under this standard where the official "[1] act[ed] intentionally in a manner that [2] put[] the plaintiff at a substantial risk of harm, [3] without taking reasonable steps to abate that risk, and [4] by failing to do so actually cause[d] the plaintiff's injuries." *Stein v. Gunkel*, 43 F.4th 633, 639 (6th Cir. 2022) (citing *Westmoreland*, 29 F.4th at 729). Each Defendant's liability must be assessed separately. *Id.* at 640 (citing *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022)).

### a. Officer Defendants[3]

In order to impose liability against the individual Officer Defendants, Plaintiff must establish that each "personally" participated "in the unconstitutional action." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020) (quoting *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

---

[3] The Court notes that the Officer Defendants purport to have submitted a memorandum in support of their motion for summary judgment [*See* Doc. 43]. However, that document is a copy of their motion [*Compare* Doc. 40 *with* Doc. 43].

14

The Officer Defendants have set forth undisputed proof that there was no indication that any of Plaintiff's alleged assailants posed a risk to Plaintiff prior to their placement in the Delta unit, and there is no indication that Plaintiff informed Jail staff that he was threatened or anticipated an assault by these cellmates [*See, e.g.,* Doc. 46 ¶¶ 20–24]. Thus, Plaintiff has not cited any evidence of any Officer Defendant's personal involvement in a constitutional violation. That is, Plaintiff has not cited any evidence that would permit a reasonable jury to find that any Officer Defendant either classified Plaintiff improperly or placed Plaintiff in the Delta unit despite a known or obvious risk to Plaintiff. The Officer Defendants are entitled to summary judgment as to this claim.[4]

### b. Sheriff Hammond

Plaintiff maintains that Sheriff Hammond violated his Fourteenth Amendment rights. Any liability against Sheriff Hammond must be based on his "own unconstitutional behavior." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989). However, Plaintiff cites no

---

[4] The Officer Defendants are otherwise entitled to qualified immunity, which protects government officials from individual liability for conduct that does not violate clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quotation omitted). Once a defendant raises a qualified immunity defense, the plaintiff has the burden of showing it does not apply. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). To meet this burden, the plaintiff "must point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) (citation omitted).

Plaintiff attempts to avoid this burden by maintaining that Defendants' argument depends on disputed facts [Doc. 58 p. 10–11]. But, as Defendants correctly note, Plaintiff "has not identified clearly established authority requiring officers to prevent unforeseeable inmate assaults or guarantee uninterrupted administration of specific medications prescribed by outside providers" [Doc. 59 p. 7].

evidence that Sheriff Hammond knew Plaintiff was even housed in the Delta unit, much less that he permitted the placement with knowledge of a known or obvious risk to Plaintiff.

And Defendant Hammond cannot be liable for the acts of others based on his supervisory position as Sheriff. *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (providing that "a complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights" to state a claim upon which relief may be granted); *Iqbal*, 556 U.S. at 676 (noting that "our precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior"). Instead, to prevail on a theory of supervisory liability, Plaintiff must "show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)); *see also Cardinal v. Metrish*, 564 F.3d 794, 802–03 (6th Cir. 2009) ("We have held that, even if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" (quoting *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002))). Plaintiff must submit evidence that Sheriff Hammond "did more than play a passive role in the alleged violation . . . . [as] [s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (citing *Leach*, 891 F.2d at 1246).

Here, Plaintiff has not cited any proof in the record from which a reasonable jury could find that Defendant Hammond abandoned his duties as Sheriff in a manner that led to potential danger to inmates, such that he could be liable under § 1983 for failing to protect Plaintiff from the inmate attack. *See Troutman v. Louisville Metro Dep't of Corrs.*, 979 F.3d 472, 487–88 (6th

16

Cir. 2020) ("The supervisor must have abdicated his or her job responsibility, and the '*active performance* of the [supervisor's] individual job function' must have directly resulted in the constitutional injury." (citing *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (emphasis in original))). Accordingly, Defendant Hammond is entitled to summary judgment as to Plaintiffs' failure-to-protect claims against him in his individual capacity.

### c.    QCHC/Healthcare Defendants

To the extent Plaintiff's complaint may be construed to assert a failure-to-protect claim against Defendant QCHC or the individual Healthcare Defendants, the Court finds that the undisputed summary judgment evidence demonstrates that these Defendants do not bear any responsibility for the physical safety of inmates or their housing conditions [*See* Doc. 55 ¶ 54; Doc. 56 ¶ 10; Doc. 58 p. 18 ¶ 54]. Accordingly, no reasonable jury could find that QCHC or any Healthcare Defendant bears any liability as to Plaintiff's failure-to-protect claims, and these Defendants are entitled to summary judgment as to this claim.

### 2.    Medical Care

Plaintiff also asserts a Fourteenth Amendment claim for the denial of adequate medical care against all Defendants. To sustain such a claim, Plaintiff must present evidence from which a reasonable jury could conclude "(1) that [he] had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 317 (6th Cir. 2023) (citations and internal quotation marks omitted).

QCHC, as a corporation, "cannot be held liable . . . on a respondeat superior or vicarious liability basis." *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1129–30 (11th Cir. 1992)). Instead, it can only be liable for

17

constitutional violations taken pursuant to an official policy, custom, or practice. *See Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 691 (1978) (holding that municipalities cannot "be held liable [except for] action pursuant to official municipal policy of some nature"). To make such a showing, Plaintiff "must 'identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)).

### a. Officer Defendants & Sheriff Hammond

Plaintiff's medical care claims do not focus on the Officer Defendants or Sheriff Hammond. But even so, the Court notes that Plaintiff identifies no evidence that Sheriff Hammond or any Officer Defendant denied, delayed, or interfered with his care. Rather, the undisputed record establishes that the COs promptly summoned medical care for Plaintiff upon discovering he had been assaulted [*See* Doc. 49-1 p. 1; *see also* Doc. 53 p. 128]. And absent obvious constitutional violations not present here, non-medical Jail staff were entitled to rely on medical professionals for inmates' medical care. *See Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014); *Cf. Hehrer v. Cnty. of Clinton*, 161 F.4th 955, 964 (6th Cir. 2025) (noting officer may not be entitled to defer to medical judgments where, for example, the officer knows the medical worker mistreats inmates). Accordingly, the Officer Defendants and Sheriff Hammond are entitled to summary judgment for Plaintiff's medical-care claims against them in their individual capacities.[5]

---

[5] These Defendants are also entitled to qualified immunity, for the same reasons noted in Part III.A.1.a, *supra*.

18

### b.       QCHC/Healthcare Defendants

Plaintiff maintains that QCHC and the Healthcare Defendants acted with deliberate indifference in (1) failing to properly administer his prescribed HIV prophylaxis medication and (2) failing to adequately treat and manage Plaintiff's pain with opioid and non-opioid pain medication prescribed following Plaintiff's assault [Doc. 58 pp. 20–23, 115–24, 126–31]. Specifically, he notes that Defendants expressly admit that he missed his prescribed evening doses of both Isentress and Descovy on April 17, and a reasonable jury could conclude that missing a prescribed post-exposure HIV prophylaxis following a sexual assault creates a substantial risk of serious harm [*Id.* p. 8].   He also notes that the QCHC records reflect missed and interrupted doses of his other medications, and that a reasonable jury could conclude that by Defendants not providing treatment as ordered, Defendants knowingly disregarded a serious medical need [*Id.* p. 8].

***Prophylactic medication***.   To recap, at 12:02 a.m. on April 16, 2022, following his return to the Jail from Erlanger, Plaintiff received a full physical assessment [*See, e.g.*, Doc. 53 p. 96–99].   Dr. Bates then substituted guideline-acceptable alternatives for the medications prescribed to Plaintiff at Erlanger [Doc. 56 ¶ 12].   Plaintiff received all prescribed doses of these medications on April 16 and April 18 [Doc. 56 ¶¶ 13, 15; Doc. 53 pp. 46, 50, 51, 100, 101, 109].   Plaintiff received his morning dose of Isentress on April 17 but missed the evening dose of both Isentress and Descovy, for reasons not apparent from the record [Doc. 56 ¶ 14; Doc. 53 pp. 67–69]. Plaintiff was released from custody on April 19, ending QCHC and the Healthcare Defendants' obligation to administer medication [Doc. 56 ¶ 16].

Therefore, the undisputed record demonstrates that Plaintiff missed a single medication pass of his prophylactic medications on the evening of April 17 [Doc. 56 ¶ 14; Doc. 53 pp. 67–

19

69]. But to base a denial-of-medical-care claim on the "occasional missed dose[] of medication[,]" the missed dose must have posed a sufficiently serious risk of harm. *Simerly v. Blount Cnty. Jail Med. Staff*, No. 3:24-cv-101, 2024 WL 3997471, at *4 (E.D. Tenn. Aug. 29, 2024) (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897–98 (6th Cir. 2004) (collecting cases). And Dr. Bates testified that because Plaintiff's failure to take a single dose of these medications would not create a substantial risk that Plaintiff might contract HIV [Doc. 56 ¶ 17].

And while Plaintiff asserts that missing a single dose of these medications caused him harm, he offers no medical evidence to rebut Dr. Bates' contrary testimony. The conclusion that serious harm was substantially likely from Plaintiff, a lay person, rests solely on speculation. *Design Basics, LLC v. Petros Homes, Inc*., 240 F. Supp. 3d 712, 717 (N.D. Ohio 2017) (providing "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact" on a motion for summary judgment) (citing *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998)).

The Sixth Circuit has specified that "[a] prisoner's allegation that a prison has failed to treat his condition adequately . . . is evaluated under the effect-of-delay standard." *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th Cir. 2017). In such cases, the plaintiff must produce "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013); *see also Napier v. Madison Cnty.,* 238 F.3d 739, 742 (6th Cir. 2001) (holding claim based on delay in treatment requires plaintiff to "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed") (citation omitted); *Anthony*, 701 F. App'x at 463 (finding that where the plaintiff challenged defendants' decision to deny him a colostomy, he had to "present a medical expert who can speak to the necessity of such a treatment and evaluate

20

it vis-à-vis the treatment he received" and that, without such "medical testimony, his claim cannot succeed as a matter of law"). Plaintiff has not presented any such evidence.

Therefore, Dr. Bates has presented unrebutted testimony that one missed dose of HIV post-exposure prophylaxis medication does not meaningfully reduce the efficacy of the prescribed regimen, and Plaintiff's uncorroborated assertions to the contrary rest solely on impermissible speculation and conclusory statements. Accordingly, there is no genuine disputed issue of material fact on this point, and QCHC and the Healthcare Defendants are entitled to summary judgment on this claim.

*Pain medication*. Plaintiff testifies that he did not consistently receive his prescribed pain medication while in custody, even though he experienced ongoing pain and symptoms [Doc. 58 pp. 20–23]. And while he concedes that his Jail medical records reflect certain PRN medications were marked as "not needed[,]" he notes that no assessments were documented to support those entries [*See, e.g.*, Doc. 58 pp. 7, 115–24, 126–31]. Thus, he maintains, a reasonable jury could conclude that repeatedly withholding pain medication from an inmate with documented serious injuries, without meaningful assessment, constituted deliberate indifference to a serious medical need.

The undisputed evidence demonstrates that before he was released from hospitalization, Plaintiff was prescribed (among other medications), Ibuprofen (Motrin) and Hydrocodone-acetaminophen (NORCO) for pain, Hydroxyzine (Atarax) for anxiety, and methocarbamol (Robaxin) for muscle spasms [Doc. 53 pp. 10, 11, 12, 13]. Dr. Kern discontinued Plaintiff's prescriptions for Hydrocodone, methocarbamol, and hydroxyzine upon Plaintiff's return to the Jail, substituting them with the alternative medications Naproxen (Aleve) and APAP (acetaminophen) [*Id.* at 77]. Even so, on the morning of April 16, 2022, Plaintiff received doses

21

of Ibuprofen, Methocarbam, Hydroxyzine, Naproxen, Tylenol, and Hydroco/APAP [*Id.* at 110–115]. That evening, Plaintiff received Tylenol and Naproxen for pain relief [*Id.* at 104–05].

On the morning of April 17, 2022, Plaintiff was given Ibuprofen, Naproxen, and Tylenol [*Id.* at 70–72]. Plaintiff missed his pain medication during the evening pill pass, just as he missed his prophylactic medications [*Id.* at 62–64].

During the morning pill pass on April 18, 2022, Plaintiff was given Ibuprofen, Naproxen, and Tylenol [*Id.* at 47, 55–56]. Plaintiff refused Naproxen and Tylenol during the evening pill pass on April 18, 2022 [*Id.* at 52–53].

At 6:15 a.m., on April 19, 2022, Plaintiff received Ibuprofen, Tylenol, and Naproxen [*Id.* at 28, 30, 31].[6] Plaintiff was released later that morning [Doc. 56 ¶ 16].

Therefore, Plaintiff's medical records reflect an ongoing pain-management regimen. Plaintiff's pain medications were missed only during the evening pill pass on April 17, 2022, which is not a lack of medical treatment rising to the level of a constitutional violation. *See, e.g., Simerly*, 2024 WL 3997471, at *4 (finding that missing one daily dose of medication does not give rise to a constitutional claim); *Stone v. Cheboygan Cnty.*, No. 00-CV-10404-BC, 2002 WL 507504, at *5 (E.D. Mich. Apr. 4, 2002) (finding that "[a]n occasional missed dose [of medicine], and missed scheduled, non-emergency medical appointments, do not pose a substantial risk of serious harm" sufficient to satisfy the objective component of a constitutional claim) (internal quotation marks omitted). Nor does it establish deliberate indifference that QCHC personnel discontinued

---

[6] At the same pill pass, Plaintiff also received additional medications that were prescribed the previous day [*See, e.g.*, Doc. 53 pp. 27, 29, 37–39]. The parties do not offer an explanation as to why Plaintiff's prophylactic medications were not included in this pill pass. Instead, they agree that Plaintiff was released before medications were scheduled to be administered [Doc. 55 ¶ 35; Doc. 56 ¶ 16; Doc. 58 p. 16 ¶ 35].

certain medications prescribed for Plaintiff in the emergency room, as he was prescribed alternatives to address the same issues. *White v. Corr. Med. Servs., Inc*., 94 F. App'x 262, 264 (6th Cir. 2004) (holding prison doctor did not act with deliberate indifference to inmate's medical needs by discontinuing previous physician's course of treatment and prescribing allegedly "less effective medications"); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996) ("[W]here the plaintiff has been treated for diabetes but disagrees with the efficacy of the treatment, he has, at best, alleged a claim for medical negligence.") (citation omitted); *see also Tribe v. Englelsgjerd*, No. 00-10451-BC, 2002 WL 31051984, at *3 (E.D. Mich. Sept. 11, 2002) (holding prison doctor was not deliberately indifferent in prescribing alternative medication for prisoner's medication of choice where prisoner provided no evidence that the alternative medication was ineffective).

Plaintiff also attempts to avoid summary judgment by emphasizing that there is no documentation as to why he missed or refused pain medication, even though he testifies that he was experiencing "significant physical . . . distress" when he spoke to his mother [*See* Doc. 58 p. 22 ¶¶ 17, 21]. But Plaintiff has not presented any evidence to support the conclusion that his pain medications were deliberately withheld on these occasions. Neither has he presented evidence that he told any medical staff member that he was experiencing pain and was ignored.

Equally important, Plaintiff challenges the adequacy of his pain management, so he must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" to sustain his claim. *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). And prisoners must generally introduce medical evidence, typically in the form of expert testimony, to prove grossly inadequate care. *Id.* Here, Plaintiff has not presented any expert or medical evidence to establish that he had an objectively

23

serious medical need to which any named Defendant provided unreasonable treatment. Accordingly, no reasonable jury could conclude that either QCHC or the Healthcare Defendants acted with deliberate indifference to Plaintiff's medical needs, and they are entitled to summary judgment.

### B. Municipal Liability

Plaintiff maintains that the County and Sheriff Hammond are liable for the Fourteenth Amendment violations alleged under a *Monell* theory of liability for failure to train and supervise [Doc. 1 ¶¶ 133–45]. The County asserts that it is entitled to summary judgment because (1) Plaintiff cannot demonstrate that the County had a policy or custom that directly caused his injuries, and (2) he cannot show that the County acted with deliberate indifference to the risk of constitutional violations and that inadequate training or supervision actually caused his injuries [Doc. 42 p. 3].

"A municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell*, 436 U.S. at 690). But a municipality's liability lies only for its "*own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Accordingly, a plaintiff cannot recover against a municipality "for an injury inflicted solely by its employees or agents." *Monell,* 436 U.S. at 694. Instead, a municipality may be subject to liability where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.* The same is true for any claims against Sheriff Hammond in his official capacity, as suit against him in his official capacity is the equivalent of suit against the County. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

24

Municipal claims, commonly referred to as *Monell* claims, require a plaintiff to show "an affirmative link between [a municipality's] policy or custom and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Thus, to hold a defendant liable under *Monell*, "a plaintiff must identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner*, 8 F.3d at 364 (citation and internal quotation marks omitted).

In addition to identifying a municipal policy or custom, "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* This is because "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id.* at 415. This policy or custom must be the "moving force" behind the alleged constitutional deprivation. *Id.* at 408.

> There are at least four recognized theories under which a municipality may be held liable:
>
> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). As the Court understands Plaintiff's complaint, he seeks to impose liability against the County under the third and fourth *Monell* theories of liability [*See, e.g.*, Doc. 1 ¶¶ 135–142; Doc. 58 p. 9–10].

25

### 1. Failure to Train or Supervise

Under a failure-to-train/supervise theory of liability, a plaintiff can "seek to establish that a municipality followed an unofficial custom of inadequately training or supervising the employees who caused the harm." *Gambrel v. Knox Cnty.,* 25 F.4th 391, 408 (6th Cir. 2022). But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train[,]" *Connick*, 563 U.S. at 61, because an "officer's shortcomings may have resulted from factors other than a faulty training program[,]" *City of Canton v. Harris,* 489 U.S. 378, 390–91 (1989). It is not sufficient for a § 1983 plaintiff to show that his specific injury could have been prevented or avoided if the municipality had more or better training. *Id.* Instead, to establish municipal liability under a failure-to-train-or-supervise theory, "a plaintiff must show: '(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

In order to demonstrate that the municipality acted with "deliberate indifference" to the risk of a constitutional violation based on a failure to train or supervise, a plaintiff must demonstrate either (1) a "pattern of similar constitutional violations by untrained employees" or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotation marks and citations omitted).

Here, Plaintiff argues that "the record reflects that housing units were operated without adequate officer presence despite known risks of inmate-on-inmate violence" [Doc. 58 p. 10].

26

But Plaintiff has not produced evidence of a pattern of similar constitutional violations that would have put the County on notice that its training or supervision was inadequate. That is, there is no proof in the record of other similar, related instances where the County was held liable for civil rights violations based on inadequately trained or supervised officers.[7] Accordingly, there is no genuine dispute of material fact as to the applicability of this theory.

Because Plaintiff has failed to demonstrate a pattern of similar violations, he must rely on the "single-incident" theory of *Monell* liability. This theory applies in the "narrow range of circumstances" where a plaintiff can demonstrate that the need for training is so obvious that failure to provide it amounts to deliberate indifference. *Gambrel*, 25 F.4th at 408 (citing *Connick*, 563 U.S. at 63). But Plaintiff has not identified any training failures or supervision failures in this case that present a level of obviousness amounting to deliberate indifference.

In fact, the only proof Plaintiff puts forward to support such an assertion are the declarations of Plaintiff and his mother, Ms. Eyssen [*See* Doc. 58 pp. 20-23, 25–27]. And neither is evidence that supports Plaintiff's position. First, Plaintiff's mother's declaration includes the inadmissible hearsay that she "was informed by jail staff that the facility was understaffed during the Easter holiday weekend" [Doc. 58 p. 25 ¶ 8]. Ms. Eyssen's declaration is inadmissible, as it is not based on her own knowledge of staffing levels at the Jail. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge,

---

[7] Plaintiff's complaint recounts various alleged events to support his assertion that the Jail "has long had the reputation of being a poorly run and dangerous jail" [Doc. 1 ¶¶ 2–4, 68–86]. But Plaintiff's complaint is unsworn, and thus, the Court does not consider its allegations evidence for purposes of summary judgment. *Farr v. Centurion of Tenn., LLC*, No. 21-5094, 2022 WL 18457630, at *1 (6th Cir. Aug. 1, 2022) (noting that the "district court . . . properly declined to consider as evidence the allegations in [the plaintiff's] complaint and the arguments in his responses to the motions for summary judgment . . . because his complaint was not verified and his responses were not sworn or submitted under penalty of perjury").

27

set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Instead, it offers an unidentified person's out-of-court statement for its truth, and therefore, it cannot be considered at summary judgment.[8] *See Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 378 (6th Cir. 2002); *see also Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 495 (6th Cir. 2002) ("A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact.").

The only other proof put forward by Plaintiff regarding staffing or supervision is his own assertion that he "did not observe any jail staff intervene" during the assault [Doc. 58 p. 21 ¶ 9]. Plaintiff has not set forth any evidence concerning Jail staffing levels or supervision.[9] And the fact that Plaintiff did not see a staff member intervene during the assault is not proof that the Jail was improperly staffed or supervised, or that the officers were improperly trained in circumstances where the failure to train or supervise is so obvious as to amount to deliberate indifference.

Regardless, even assuming Plaintiff could establish deliberate indifference with regard to this claim, he cannot demonstrate that improper training or supervision "actually caused" his injury. *Gambrel*, 25 F.4th at 409 (citing *Connick*, 563 U.S. at 70). Plaintiff does not cite any admissible evidence in the record that untrained (or poorly trained) or unsupervised (or poorly supervised) Jail personnel were responsible for harm to Plaintiff. And to establish causation, a

---

[8] The same is true for other parts of Ms. Eyssen's declaration insofar as it recounts what her son allegedly told her about, for example, staffing, surveillance, medical decision, and conditions [*See* Doc. 58 p. 25–27].

[9] The County and Officer Defendants have produced the Shift Briefs and Team Duty Rosters for April 15, 2022 [*See* Docs. 48, 48-1, 48-2]. But neither Plaintiff nor Defendants address whether these documents yield any information about whether the staffing and supervision levels were adequate on April 15, 2022 [*Id.*]. Instead, the documents appear to have been produced as evidence that "it is apparent that numerous officials and former officials are named as Defendants who were literally not present at the time of the event in question" [Doc. 48 ¶ 7].

28

plaintiff must show that "proper training would have prevented" the harm. *Id*. Plaintiff has not

identified what training or supervision was lacking, nor has he shown how such training and

supervision would have prevented the actions of the other inmates. The County, meanwhile, has

presented undisputed proof that the County requires its officers to receive significant initial and

annual training [Doc. 46 ¶ 25; Docs. 47, 47-1–47-4]. Accordingly, Plaintiff has failed to

demonstrate that there is a genuine dispute of material fact regarding the applicability of this

theory.

### 2. Custom of Tolerance or Acquiescence

Where municipal-liability claim is premised on a custom of tolerance or acquiescence—

sometimes referred to as an "inaction theory" of liability— a plaintiff must prove the following:

> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [County];
> (3) the [County's] tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction; and
> (4) that the [County's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe v. Claiborne Cnty.*,

103 F.3d 495, 508 (6th Cir. 1996)); *see also Powers v. Hamilton Cnty. Public Def. Com'n*, 501

F.3d 592, 607 (6th Cir. 2007).

In his complaint, Plaintiff cites numerous alleged incidents at the Jail to support his claim

that the County had a policy or custom of deliberate indifference to inmate safety, medical needs,

and living conditions [Doc. 1 ¶¶ 65–86]. However, there is no proof in the record of a single

previous finding of a constitutional violation at the Jail regarding a prisoner's safety, medical

needs, and/or living conditions.[10] And because Plaintiff has not produced any evidence that

---

[10] As noted above, the allegations in Plaintiff's unsworn complaint reciting various events that have purportedly occurred at the Jail are not summary judgment evidence. *See, e.g., Farr*,

29

would support a finding that the assault against him or the care he received was representative of "a clear and persistent pattern of illegal activity," *Thomas*, 398 F.3d at 433, Plaintiff fails to demonstrate that there is a genuine issue of material fact that the County bears liability on an inaction theory of liability.[11]

### C.     State-Law Claims

Because the Court grants summary judgment to Defendants as to Plaintiff's federal claims, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over any remaining State-law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726–27 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

## IV.    CONCLUSION

For the reasons set forth above:

1.  Defendants' motions for summary judgment [Docs. 39, 40, 41, 54] will be **GRANTED** as to Plaintiff's federal claims;

2.  The Court will **DECLINE** to exercise supplemental jurisdiction over Plaintiff's State-law claims; and

3.  This action will be **DISMISSED**.

---

2022 WL 18457630, at *1.

[11] In response to Defendants' motions, Plaintiff requests "limited discovery of surveillance video before ruling on summary judgment" under Rule 56(d) [Doc. 58 p. 11].   But this action has been pending since April 2023 [Doc. 1], and Plaintiff could have, but did not, request this discovery during the time set forth to do so.   Nor does Plaintiff identify any facts that additional discovery would reveal.   Accordingly, there is no indication that additional discovery would change the Court's conclusion that Defendants are entitled to summary judgment as to Plaintiff's federal claims.   *Health & Wellness Lifestyle Clubs, LLC v. Raintree Golf, LLC*, 808 F. App'x 338, 346 (6th Cir. 2020) ("A district court does not abuse its discretion [by denying discovery in the face of a summary judgment motion] when, as here, granting a party's request for additional discovery 'would not have changed the ultimate result.'" (quoting *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1197 (6th Cir. 1995))); *see also Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004) (finding courts do not abuse their discretion in denying discovery requests supported only by general and conclusory statements regarding the need for more discovery).

30

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**ENTER:**

/s/

**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

31